We've got only one argued case this morning, and that's J.R. v. Barr. And we've got students from the University of Washington Law School arguing on behalf of the petitioner. There's ten minutes set for argument. It's sometimes difficult to keep track of your time. And if we run over, we'll make sure that your full counsel has a chance to make the rebuttal. So, when you're ready. And I should say, welcome to the ninth circuit. We're very pleased to have you here. I say here in quotation marks. I'm sorry we're not actually physically in Seattle. We always enjoy Seattle, but we're in Seattle virtually. And the third case, and only argued case this morning, J.R. v. Barr. And when you're ready. Your honors, and may it please the court. My name is Eva Sharp. I'm a law student at the University of Washington. And I represent the petitioner, J.R. With the court's permission, I would like to reserve two minutes for Mallory McGill to do the rebuttal. Okay. Thank you. Your honors, the agency made a number of errors that require reversal. I would like to address first, the agency's speculative conclusion about why El Salvador stopped assisting J.R. And second, the agency's untenable view of the threat to J.R. as coming only from nine individual gang members. Excuse me, counsel, could you talk a little louder? I don't know if it's my audio system or your audio system, but it's just a little soft for me. Yes, your honor. Do you want me to back up a little? Thank you. Great. That's better. Okay. I would like to address first, the agency's speculative conclusion about why El Salvador stopped assisting J.R. And second, the agency's untenable view of the threat to J.R. as coming only from nine individual gang members. To my first point, the BIA failed to recognize that El Salvador is unable and unwilling to protect J.R. because the IJ concluded, without any evidence and despite all evidence to the contrary, that El Salvador discontinued support, quote, because any harm apparently that the government of El Salvador thought J.R. would be subject to had passed. The IJ pulled this finding out of thin air. There is absolutely no evidence that El Salvador thought J.R. was safe. In fact, the record compels the conclusion that he was an extraordinary gangster who was a testifying witness and that El Salvador knew it and told him to flee. J.R. testified that he received a death threat from the local leader of the 18th Street gang. This is a credible and specific death threat from a note- Excuse me. Excuse me, counsel. Frankly, I think this part of your argument is very strong. There's another part of the case that's bothering me, and I'd like to tell you what's on my mind so that you can educate me. On the one hand, it seems like Henriquez-Rivas is very strong for you, and a lot of the government's argument, I imagine, is likely to be about distinguishing Henriquez-Rivas, so you might want to address why it can't be distinguished. On the other hand, there's kind of an inherent problem with the argument that bothers me, and I don't know quite how to deal with it, and that is that people who testify against gangs, whether it's the 18th Street gang in El Salvador or whether it's the mafia or other gangs in the United States, it's always a scary business because they sometimes get killed. In the United States, if it's a big enough case to attract federal money, we've got an elaborate and fantastically expensive witness protection program, and you're obviously right. They didn't in El Salvador. What they had was cops protecting him until he testified, and then he was on his own. Why would you have – and the nephew who cut off his fingers is in Colorado. It sounds like they can probably even reach to the United States. So what's the point of asylum in a case where it's really about protecting witnesses who testify against gangs since they're at risk of their lives anywhere? Yes, Your Honor. To your first question, you're correct that Enriquez Rivas cannot be distinguished. That case was about a witness who testified against this same gang, the 18th Street gang in El Salvador, and the Ninth Circuit decided that that person was eligible for asylum. They met the criteria to be in a particular social group, and they were persecuted on account of their witness testimony. That's precisely what happened to J.R. in this case. And second, of course, yes, testifying against this dangerous gang is extremely dangerous. However, that danger was specifically focused in El Salvador when it comes to J.R.'s particular case. He testified before the immigration judge that the local leader of the 18th Street gang is the one who threatened him, and that after he received that threat and during trial, even after that local boss was arrested, gang members in El Salvador were coming after him daily. Why can't they do it here? The nephew who cut off his fingers, chopped off his fingers, is in Colorado. Won't they just make a phone call to the nephew and he'll take care of business here in the U.S.? He may very well be at some risk here. That's precisely why we've asked the court to proceed anonymously in this case. But that isn't the question. That isn't the legal question when it comes to asylum. He is at far less of a risk here than he is in El Salvador. And the question is, was he persecuted on account of his witness testimony? The record answers that question in the affirmative. And is El Salvador unwilling or unable, again, there are alternative grounds where he can win, to protect him. And the record compels the conclusion that he is eligible for asylum. Counsel, this is Judge Rawlinson. Could you pinpoint for me the persecution that took place after he testified? Where in the record is there evidence of how he was harmed after he testified? Yes, Your Honor. In the record, the administrative record at 245, he testified that after he was threatened and during trial, gang members were, quote, looking for me every day to kill me. You said during trial. How about after the trial? Where in the record can we look to see any persecution following his testimony? Your Honor, he was not physically harmed after trial. But during those months, he was subject to a credible and outstanding death threat. He knew that this gang would kill him if he stayed. He testified to the immigration judge that that's precisely why he left and that he will be killed if he is returned to El Salvador. How long after the trial did he leave? It was just about two months at most, Your Honor. This is Judge Fletcher. This is two months after the protection ceased, he left. I've got another question related to Judge Rawlinson's question. He testified against gang members twice. That is to say, he testified against his nephew who cut off his fingers. And his nephew then is put in jail for several months. And after that happens is when he got shot and when his son got shot. That's correct, Your Honor. And you're pointing to this pattern where every single time J.R. reports to police and they investigate and even convict members of this gang, he is subject to another incident of horrible and escalating violence. Well, Counsel, he was not after he testified the second time. That is correct, Your Honor. He didn't suffer physical harm because he managed to survive for a mere two months before he realized he needed to flee. And the law does not require him to stay in El Salvador for long enough to get killed just to prove that he is at risk of getting killed. This court has said so explicitly in Kaiser v. Ashcroft. It said that, quote, a post-threat harmless period need not vanquish an asylum claim. Could you help me a little more on Judge Rawlinson's question? Very significant question. What happened other than his subject of fear during the two months following the withdrawal of police protection? Your Honor, he was moved to Zulaton where he realized that that was just not going to keep him safe. You're telling me what he realized. What I want to know is anything, an oral threat or a physical violence of some sort or anything during the two months following withdrawal of protection. I'm just following up on Judge Rawlinson's question. Yes, Your Honor. He didn't testify that nothing happened during that time. He testified that he received the death threat. This is at page 245 in the administrative record, which essentially said, if you testify, we will kill you. He testified, and then immediately following trial, El Salvador withdrew any assistance to him. It is unreasonable to assume that that threat no longer existed after trial. This man had lived in El Salvador for over 50 years, and the judge in the trial told him to, quote, leave to get out of there. This is the Salvadoran government recognizing the danger that he faced and that they could not protect him in El Salvador and telling him to leave. I see that I'm far over eight minutes, Your Honor. If there are no further questions, I would like to reserve the balance of my time. Is that right? Are there no further questions from the bench at this time? Not at this time. Not at this time. Thank you very much, and we'll make sure that your co-counsel has sufficient time for rebuttal. Thank you, Your Honor. Let's hear from the government. Good morning, Your Honor. I'm sorry, I'm going to unmute my video. Good morning, Your Honor. May it please the Court, my name is David Kim for the U.S. government. I'd like to start by addressing the fact that there are three discreet events here. The first event is an attack by J.R.'s nephew against him. Now, this occurred in the year of 2012, more than three years before the following two events. Now, counsel portrays these three events as an escalation of violence, a concatenation of events that are somehow tied together, but the record evidence doesn't actually bear out that argument. In 2012, after J.R. was attacked by his nephew, there was a trial. The nephew was convicted and he was in prison, and the record shows. Counsel, this is Judge Fletcher. What was the date of the trial? That is to say, when did he testify against the nephew? That's not actually clear from the record. The record doesn't actually expressly indicate what the date was, but by all indication, it appears to have been before that second attack in January of 2016. So if we do surmise that it did follow in the month after the attack by the nephew, then that will give you a rough estimate of about 2013 possibly, and that would still be more than two years before the second attack. And in any case, the fact that the nephew was an 18th Street gang member, that may very well have been an incidental fact. By his own testimony, J.R. stated that the nephew was after his land. This appeared to be a private land dispute and not something that was gang related. And so to tie these things together. Again, excuse me. It's a little hard to overtalk, so we'll just do the best we can. I think he did testify that that's why the nephew cut off his fingers in the first instance. Did he so testify as to that was why he was shot afterwards? Well, so as to the second and third events, he gave conflicting explanations as to why he thought the gang members were coming after him. Now, it's worth noting that in the second and third attacks, he never actually mentioned that the nephew was involved. As far as the record indicates, the nephew was involved in only the first attack in 2012 and not the second and third attacks in 2016. And so to say that these three events are somehow bound up together is plain wrong. The record doesn't actually corroborate that. And so, again, to resume. Could you address Henriquez-Rivas? I'm sitting here waiting for the distinction between this case and Henriquez-Rivas, and you might as well get it off my mind so I can pay attention to the rest of your honor. Sure. Yes, Your Honor. I figured that Your Honor may have some questions about Henriquez-Rivas, so I did do a line-by-line, very thorough reading of that case. Now, Henriquez-Rivas did not establish as a matter of fact or law that open court witnesses in El Salvador comprised a cognizable PSG. The court there found only that the board failed to apply its precedent in assessing a PSG claim. That's the exact reason why they re-ment the case. To get a bit more specific, the board— Witnesses against the gang who testify in open court may well be a social group for purposes of the statute. It did leave open that possibility, but it left that possibility for the board to further delve into. This court carefully laid out the two prongs of particularity and social distinction. Now, as to particularity, the court said that the board did not follow its own precedent as laid out in EA and its progeny cases with regard to social visibility or distinction. As to the second prong, particularity, the court said that it was unclear—unclear—whether the board actually found that HR's—Henriquez-Rivas' proposed group lacked particularity. And so while it didn't rule out the possibility that such a group could be cognizable, it didn't expressly find a group that was cognizable. In fact, it actually stated that this is a case—in fact, a specific kind of inquiry, and this analysis needs to be done on a case-by-case basis. But in any case, cognizability is not at issue here. The focus here is actually very, very narrow. It doesn't involve whether JR suffered harm in El Salvador. The IJ found that his testimony was credible that he did suffer harm, nor does it involve how likely it is that he would suffer harm if he were to return to his own country. The sole issue—the sole issue is whether he's met his burden of proving that the authorities there are unable or unwilling to protect him. And to make his point, JR passes over certain critical details of his own testimony, including his admission that he suffered no harm—no harm after the attack on his son because, quote, the police were there. Indeed, the record shows— This is Judge Fletcher. Sorry for interrupting. That's absolutely right. When the police were there, he was not attacked. Two months before he left, the police and the prosecutors ceased any protection. So when he says, well, I wasn't attacked because the police were there, that doesn't help you because we're in a situation two months before he leaves that the protection ceases. So we're talking about unwilling to protect. So the question is, what's the danger now that the government is unwilling to protect? Well, I think it's really important how we frame the situation here. Now, in Petitioner's brief, JR says a few times that the El Salvadoran authorities really had no interest in him, that they were using him, that their purpose was different from his. But that's not actually the case. Now, this was a protection program that he was put into because his assailants were on trial. Now, granted, he may not have gotten— When you call it a protection program, and I picked this up in the briefs and I picked it up from the ALJ and the BIA, it's sort of confusing. Police in many places will protect a witness pending his testimony. They don't want to lose the case. They protect the witness until he testifies. But a witness protection program such as we have in the United States protects a witness for the rest of his life subsequent to his testimony, two entirely different things. And I thought this case was just the first thing and not the second thing. Am I mistaken? You're not mistaken, Your Honor. At the same time, the IJ in this case was bearing down on what specifically the words special witness protection program might mean. Now, that term was actually used a couple times during the hearing, but the IJ didn't raise any objection during the hearing or after his appeal to the board. On top of that, she actually referred to himself as a protected witness. And so while it may be true that he didn't receive the raft of protections normally associated with the United States, that wasn't actually the implication that was made by the IJ in rendering his decision. All he was saying was that JR did receive protection from the authorities after he was attacked. And for more than one year, for more than one year, from July 2016, when that third attack occurred to September 2017, when he left the country, he expressly said that nothing, nothing physically happened to him. And during that period when you were talking about nothing happened to him, only two months of that period was he unprotected, the last two months before he left? Or am I misunderstanding the record? Well, the last two months and also possibly the close to one year period before the three-month protection program. And so what we do know is that he was unharmed. Excuse me, you're saying he was not protected during that period? I thought they protected him during trial. And once the trial was finished, there was no longer any protection. And then two months later, he leaves. Am I wrong? So the protection that he received as a witness, as far as the record shows, it appeared to entail relocation services. And they also, according to him, paid for his lodging and so forth once he got to Azulitan, this other motel that he was relocated to. Maybe, maybe not. That is to say, it was a compound question as to did they move you and did they pay? And he said yes. Those are two different things. They clearly moved him, whether they paid or not, maybe, maybe not. But I want to make sure that you and I are on the same page in your answering my question. Was he protected up until two months before he left? Yes. Well, to the extent that the police and the prosecutors went vigorously after all nine of the assailants, yes, the record does show that he was protected. Now, this protection, it's expansive. It doesn't just include the witness relocation program. It contains protections that he received in the form of the police and the prosecutors going aggressively after his alleged persecutors. Well, I understand what you're saying, but I'm not sure that that helps you because you're saying that there was aggressive protection. And then when it ends, two months later, he's afraid and he leaves. Well, she does leave at the same time. There's no indication that anything happened to him in the two months after he was relocated. And so all we know— And to pick up your other side's point, he's supposed to wait around until he's killed before he leaves? Well, he's not supposed to wait around. At the same time, his belief that he would be hard to see were to return to El Salvador, that's actually speculative. The evidence doesn't actually compel the conclusion that the government hasn't been helpful in protecting him. I'm not sure that the adjective speculative really solves the case. They threaten him, if you testify against us, we'll kill you. The question, I guess, for any reasonable person in his situation, and reasonable fear is the bottom line criterion, I guess, is, is that threat credible? Sometimes people just have an argument and somebody says, I'm going to kill you, and they know he's not going to kill them. On the other hand, sometimes somebody says, we're going to kill you, and they've already killed his son and they've already shot him, and they've already chopped off his fingers. So maybe he thinks, hmm, they might do that, probably will do that. And it's a question of where on the continuum the probability that the threat will be carried out is. Why shouldn't he, once the police say, okay, we're done with your testimony, you're on your own, why shouldn't he be reasonably thinking, they told me they were going to kill me, I believe those guys. If I could make just two points to that, Your Honor. The first point is that this threat was made by Lewis. Now, Lewis is the leader of the 18th Street Gang, and as far as we can tell from the record, this threat was made while he was in prison. The attack occurred in July of 2016. It appears that he was imprisoned about the end of the year or the beginning of the following year. And so to the extent that it was made. So what, I mean, as I understand it from another case I had recently, the Aryan Nation leaders call out threats while they're in prison, and members who are out of prison carry them out. That can be done in any country. But it is important to realize that this threat was coming after his men had been scattered, had been killed in a complication with police, and after he was put on trial and convicted. And so, yes, although he is a dangerous man by all accounts, it isn't so credible considering that the police did come down aggressively against him. And as far as we can tell, he was in confinement at that point, and a lot of threats may have rung hollow at that point. And it's not entirely clear that at this point he is out of prison. For all we know, as far as the record shows, he still is in prison. And so that threat, whether it actually can be carried out by him or the other assailants, the record doesn't actually compel that conclusion. Okay. I've got a follow-up question to Judge Kleinfeld's questioning about Enriquez-Rivas. Assuming that we read Enriquez-Rivas, as I'm inclined to read it, as establishing that there is a social group, a cognizable social group, of those who have testified in open court against gang members. So, for the purposes of my question, Enriquez-Rivas establishes that proposition. Is there any factual question as to whether or not J.R. qualifies for membership of that group? There would be an outstanding factual question, because even if this court were to recognize this group as recognizable under Enriquez-Rivas, it would still have to meet the independent requirement of Nexus. And as to the third incident… You didn't understand my question. I'm reading, for purposes of my question, Enriquez-Rivas is saying that a cognizable social group is people who testify in open court against gang members. My factual question is, did J.R. testify in open court against gang members? He did say that he testified against the assailant in court, yes. And is there any dispute about that? There is no dispute about that particular factual point. If that's so, if I've accurately described the holding of Enriquez-Rivas as it is a cognizable social group, people who testify in open court against gang members, and it's undisputed that he did testify in open court against gang members, is there any reason for a remand under Ventura? Again, Your Honor, yes, there would be a strong reason for remand, because there would still be the lingering question of whether he was actually persecuted on account of his membership in that particular group, which the court recognized as cognizable. He said in turn that she wasn't quite sure why he was attacked and why his son was attacked. And he said it was a land dispute, and he said it might have been a turf war. And so he gave conflicting accounts of why she was harmed by these men. And so to resolve at least that contentious critical point, it would have to be remanded, yes. So you say that if he's killed now, it'll be because of a land dispute, rather than carrying out of the threat of the gang member who said, if you testify, we're going to kill you? How can that be a question after we've heard that threat? Well, again, he did testify that Lewis, the gang leader, did mention that he would be harmed because of his actions against the gang. But at other points in his testimony, he gave conflicting explanations. Excuse me, he did not say he would be harmed. He said he told me he would kill me. Sure, I mean, we do consider killing to be a form of severe harm. It would be a very, very severe harm, the most severe harm. But the point is, Your Honor, throughout the testimony, he did give varying explanations as to why he thought, why he believed that the assailants went after him and his son. And so to resolve at least that controvertible point, the case would have to be remanded, yes. Counsel, I have a question about the period of time that elapsed before the protection, between the time of the crime and the time of protection. What was the lapse of time there? Right, so the attack took place in July 2016. He was relocated to Azulitan in July of 2017. So he was in his hometown for about a year. And after being relocated, it appears that he left two to three months after that. So we're looking at a total period of about 13 to 14 months in which he didn't suffer any harm. And this includes a period of time when he was under this special witness protection program. I'm trying to separate that time. The time that he was in protection, I mean, I think it's safe to assume that he wouldn't be harmed. But was there any time when he was not under police protection, after the events took place for which he was going to testify? Was there any period of time that he was unharmed before the police assumed his protection? From the record, it appears that that period was about close to one year immediately after the attack in July 2017. So from about July 2017 to close to—I'm sorry, July 2016 to close to July 2017, yes, there was no harm, and he was not under that particular relocation protection. Wait, aside from relocation, was he protected? Well, again, the record doesn't actually reveal that he received the kind of protection that one would receive in a witness protection case. Did he receive any protection? Was he under police protection during that year, whether it was relocation or not? Was he under police protection of any kind during that year? Yes, he did testify that during his son's burial, quote, the police were with us, and so they didn't do anything to us. And so at least for the son's burial, he did receive protection by his own account. And at the very least, the record doesn't tell that he received no protection during that one-year period before he was relocated. So just so I understand the record, the one-year period before the protection started and the two-month period after the testimony, there was no harm, Tim. Is that accurate? Yes, exactly, precisely. Yes, that is accurate, Your Honor. Okay, we've taken you well over time, but I've got a question that's unrelated to the merits of the petition, and that is, I noticed that J.R. is detained. That is to say he's incarcerated up in the Pacific Northwest. I know also just from the record that he has one lung. He is almost 60 years old. Has the government considered the danger to him from COVID-19? Well, I would note, Your Honor, that the government has been considering potential at least temporary conditional release for people who aren't under a serious condition, and so I would have to double-check with that, Your Honor, and I can definitely file a letter with the court thereafter after I check with ICE, but there is a possibility that he may be considered for that if they deem that his condition is sufficiently severe. Well, I'm particularly concerned if we were to, for example, remand, as you suggest, for a determination by the BIA or by the IJ as to whether or not there was a nexus between his protected social group and the harm that he fears. If he's detained during that period, we're looking at a year or more during which we've got the coronavirus, and we know from various things that we read that coronavirus in prison settings is particularly dangerous. So can you help me out a little bit as to what the government's likely to do for this man during that period if we do remand? Yes, I mean, again, Your Honor, I would be happy to check with our agency partners to look into the specifics of this particular case and see whether they're actually considering a potential release for him given the pandemic. Well, and considering doesn't mean a darn thing. Considering, I mean, you know, a congressman writes back to his constituent who's written a letter that he's not going to pay any attention to, saying thank you for your views, I will consider them carefully. So you're saying that they're going to consider something doesn't tell me much. At the same time, Your Honor, that's his time. I can't really tell you what they would do with regards to JR, but I can at least give you my assurance that I will follow up with him and provide any updates with the court, apprising the court. I'm not speaking for my colleagues on this point because we've not conferred about this case before argument. But I will say it may make a real difference to me in terms of whether or not I would be willing to remand or whether I would just say I know everything I need to know, depending on whether that man will be incarcerated during the period of the remand. Understood, Your Honor. Thank you. So if you would please undertake to tell the panel as soon as you can what the I will do that. Thank you, Your Honor. Judge Fletcher is not all alone in his thinking. I'm very glad to be living in my remote log house in Alaska. I imagine if the government still had the Unabomber cabin, it would look like a real nice cabin to me, being familiar with Alaska cabins, and this fellow would probably be very happy there. So if you could undertake with reasonable promptness to supply the panel with the information as to what the government will do with respect to incarceration pending a remand, if, in fact, that's what we decide to do. That would be very much appreciated. Okay. Yes, I understand, Your Honor. I'll get on that properly. Thank you. Thank you very much. Any further questions from the bench? No. Okay. Thank you very much for your argument. Thank you. Rebuttal. Your Honor, it's Mallory McGill for the petitioner. I have two points. You might have noticed that we took the government well over time, so you should take the two minutes that you're currently allotted as a gentle hint rather than a firm deadline. Yes, Your Honor. I have two points in response to the government. First, I'd like to briefly clarify the two months before J.R. fled El Salvador. As my co-counsel began to mention, in the face of the overwhelming evidence in the record, it's a miracle that J.R. survived those two months and was able to not face any physical harm in those two months. El Salvador is the size of New Jersey, so the fact that he was able to safely flee does not negate his eligibility for asylum. Counsel, this is Judge Rawlinson. Is there any evidence in the record of any harm or attempt to harm him during those two months? Considering the fact that it's a small place, as you noted, what should we make of the fact that there was no harm or attempt to harm him? Your Honor, you're correct. There is no evidence of physical harm to J.R. during those two months. However, J.R. testified that precisely the reason he fled El Salvador was because gang members were looking to kill him, and he told the IJ that if he is removed to El Salvador, he will be killed. J.R. was found credible, and so this direct testimony on the reason for his leaving fills that void of why those two months don't negate his claim. I understand, Counsel, but pausing, Counsel, the government represented to us that a year before the police protection and two months after the testimony, there was no harm to him. What's your response to that in terms of the persecution issue? Yes, Your Honor. The government's assertion that J.R. faced no harm in the year leading up to his protection is incorrect. J.R. testified that gang members were looking for him up until at least July 2017 to kill him, and in this court, death threats and simply threats of death that are credible and specific meet the precedent in Kaiser and Duran Rodriguez. J.R. did not suffer more instances of physical harm in order to meet the persecution burden. So, Counsel, where in the record can we look to see the specific death threats that were made in the year when he was unprotected before he testified? Yes, Your Honor. On the administrative record, page 245, J.R. testified that gang members were looking for him every day to kill him, and then also the credible death threat that J.R. received, which is also on 245 from the local gang leader. These are direct pieces of his testimony that show the reasons why he was in danger and why he ultimately fled. In an interest of time, I'd like to turn to my second point. We agree with Your Honor's reading of Enriquez-Rivas. There is no need for remanding in this case for further fact-finding. With respect to the particular social group, the record answers the conclusion that J.R. is a member of the particular social group of witnesses who testify against gang members in El Salvador. And with respect to persecution, as I mentioned, J.R. meets the burden set out by this court in cases such as Kaiser and Duran Rodriguez. As Your Honor also noted, deciding this case without remanding for further investigation will ensure that J.R. does not sit in a detention cell for another year or longer. How do you distinguish Ventura here? Ventura generally requires us to remand. Yes, Your Honor. We agree with the rule in Ventura. And this case is distinguishable because Ventura, the court made a decision about a matter that the BIA had not had an opportunity to address. The court addressed the alternative argument that changed circumstances in Guatemala might have negated the applicant's asylum claim. However, here, the agency had a full opportunity to develop the record. And the agency did develop the record. And the agency knew the issues that were being raised. They knew J.R.'s claims. So this is distinguishable. Counsel, where is the nexus finding in the record? Your Honor, J.R. testified that he received a death threat because of his willingness to testify. And the nexus only requires that one central reason for the applicant's persecution was his membership in a particular social group. And so we believe the death threat on account of his membership satisfies that burden. But you're not suggesting that we make that finding, are you? No, Your Honor. However, the record as developed fully answers that question. The only purpose of remand would be for the agency to make a foregone conclusion. And we read Ventura as recognizing the general policy that the BIA developed the record and considered the issues. And in this case, the agency had an opportunity to do that. But was the record developed on the nexus question? With respect to, yes, Your Honor. Where in the record may we look to see where the agency developed the record on the nexus question? We believe that the administrative record at page 245 would answer that question. That's where J.R. testified that he received a death threat because he was willing to testify. Well, that wasn't explored in terms of giving the agency the opportunity to testify to those facts, was it? You're correct, Your Honor, that the agency did not explicitly make that finding. However, we believe on the record as developed, they had every opportunity to. If there are no further questions, we would ask this court to grant J.R.'s petition and hold that he  Okay. Was it possible on this record for the agency, if they got the case back on remand, to say, no, no, no, this guy's problem is not caused by his testimony in court, in open court against the gang, it's caused because another branch of the family, the nephew's branch, maybe his father's brother or father-in-law's something like that, son, wanted the farm and he had no right to that farm. If the agency did that, then the gang membership would drop out as the nexus. Would the record enable them to do that? And is that an unexplored question that the agency should get the first shot at? No, Your Honor. The record as developed compels only one conclusion, and that's that J.R. fled because he was persecuted on account of his witness testimony. Why does it only permit that one conclusion? Your Honor, J.R. testified that he fled El Salvador because gang members were coming to look for him every day, and the reason those gang members were coming to look for him was because he faced a death threat, and that death threat was based on his willingness to testify. And additionally, Your Honor, as I mentioned, the statute only requires that his persecution be based on account of his particular social group as one central reason. And so the fact that J.R. was, yes, persecuted on other grounds does not negate his asylum claim based on this particular social group. So if I understand the argument, this is Judd Fletcher, so if I understand the find that he has a sufficient fear of harm or death because of the threat from the gang member who said, if you testify, I kill you. If we say that that's true, he's credible, and if we say that in itself, given the background, is enough to be a credible threat of persecution, you're saying, well, that statement itself supplies the causal link. And if we believe the statement, and if that statement is the one that tells us that he has a cognizable claim in the sense of degree of harm or threat of harm, that then itself establishes the link. That's the argument? Yes, Your Honor. That's correct. Okay. Any further questions from the bench? No. Okay. Thank you very much. And on behalf of the panel, I would like to thank the University of Washington and you two students who've done a very lovely job at making the argument. It's always a great help to the court when we have pro bono counsel or hear student pro bono counsel helping us out. I would also compliment the government, but that's a different form of government compliment because the government is getting paid to do this and you are not. So we thank both sides for helpful arguments in this case. The case is now submitted. Thank you. Thank you. Thank you, Your Honor. This court for this session stands adjourned.
judges: Kleinfeld, W. Fletcher, Rawlinson